Filed 8/24/21; Certified for Partial Publication 9/22/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SIERRA WATCH, | C088130 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0038777) |
| v. | |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents; | |
| SQUAW VALLEY REAL ESTATE, LLC, | |
| Real Party in Interest and Respondent. | |

In 2016, Placer County (the County) approved a project to develop a resort on about 94 acres in Olympic Valley — the site of the 1960 Winter Olympics. Sierra Watch afterward challenged the County's approval in two lawsuits, both of which are now on appeal. In one of its suits, it alleged the County approved the project in violation of the Ralph M. Brown Act (Brown Act, Gov. Code, § 54950 et seq.) — an act intended to

facilitate public participation in local government decisions. In another, it alleged the County's environmental review of the project was inadequate.

This appeal concerns Sierra Watch's challenge to the County's environmental review for the project under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). CEQA generally requires public agencies, like the County, to consider the environmental consequences of discretionary projects they propose to approve. Per that requirement, the County considered the potential environmental impacts of the proposed development in Olympic Valley before it approved it. But in Sierra Watch's view, the County's analysis fell short. In particular, Sierra Watch maintains, the County (1) failed to sufficiently consider Lake Tahoe in its analysis, (2) insufficiently evaluated the project's impacts on fire evacuation plans for the region, (3) inadequately evaluated and mitigated the project's noise impacts, (4) failed to allow for sufficient public review of the project's climate change impacts, (5) failed to consider appropriate mitigation for the project's climate change impacts, (6) overlooked feasible mitigation options for the project's traffic impacts, and (7) wrongly relied on deferred mitigation to address the project's impacts on regional transit.

The trial court rejected all Sierra Watch's arguments. But because we find some of Sierra Watch's claims have merit, we reverse.

BACKGROUND

In 1983, the County adopted the Squaw Valley General Plan and Land Use Ordinance to "guide development and growth within the [Olympic] Valley area" (formerly known as Squaw Valley) — a 4,700-acre area that lies a few miles northwest of Lake Tahoe in the Sierra Nevada. Three decades later, in 2011, Squaw Valley Real Estate LLC (Squaw) proposed the first specific plan under that general plan, which it called the Village at Squaw Valley Specific Plan.

In 2012, the County began environmental review for the proposed project under CEQA, and three years later, the County released a draft document, called a draft

2

Environmental Impact Report or draft EIR, analyzing the project's potential impacts. As described in the draft EIR, the proposed project would include two components: an 85-acre parcel called the Village — which would include, among other things, up to 850 lodging units, almost 300,000 square feet of commercial space, and over 3,000 parking spaces — and an 8.8-acre parcel called the East Parcel — which, for the most part, would serve to house up to 300 employees for the project. These two components, the draft EIR explained, would be built over 25 years.

After the County circulated the draft EIR, various individuals, organizations, and governmental bodies commented on the project. Sierra Watch was one of the commenters. According to Sierra Watch, the draft EIR's review of the project's potential environmental impacts was inadequate for several reasons. Among other things, Sierra Watch alleged that the draft EIR failed to sufficiently consider Lake Tahoe in its discussion of the environmental setting for the project and failed to adequately discuss and mitigate the project's impacts on fire evacuation plans for the region, noise levels, climate change, and traffic levels.

In 2016, the County issued the final EIR for the project, which included responses to the comments on the draft EIR. Months later, after receiving additional comments on the final EIR, the County provided additional post-EIR responses about the project. Six days after sharing these additional responses, the County's board of supervisors heard from project opponents and supporters at a public hearing and, at the close of the hearing, the board certified the EIR and approved the project. As part of the approval, the board acknowledged that the project would have some unavoidable significant environmental

3

impacts but found these impacts would be outweighed by the project's benefits. (See Cal. Code. Regs., tit. 14, § 15092, subd. (b)(2)(B).)[1]

A month after the board approved the project, Sierra Watch filed a petition for writ of mandate and complaint, alleging the County and its board had violated CEQA. Raising largely the same issues it raised in its comment letter, Sierra Watch alleged, among other things, that the County failed to sufficiently consider Lake Tahoe in its discussion of the environmental setting and failed to adequately discuss and mitigate the project's impacts on regional fire evacuation plans, noise levels, climate change, and transportation.

Following a hearing, the trial court rejected all Sierra Watch's claims. The court afterward entered a judgment denying Sierra Watch's petition for writ of mandate and complaint.

Sierra Watch timely appealed.[2]

## DISCUSSION

## I

### *CEQA Background*

CEQA serves "to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.) To that

---

[1]    California Code of Regulations, title 14, sections 15000 to 15387 are ordinarily referred to as the CEQA Guidelines. We will use that shorthand to refer to these regulations going forward.

[2]    Shortly after it filed its CEQA action, Sierra Watch also filed a related action challenging the County's conduct under the Brown Act. In that case too, the court rejected all Sierra Watch's claims. Sierra Watch afterward appealed the court's decision, which we considered in the separate case of *Sierra Watch v. Placer County et al.* (Aug. 24, 2021, C087892) [nonpub. opn.].

end, absent an exemption, an agency proposing to carry out or approve a project generally must conduct an initial study to determine "if the project may have a significant effect on the environment." (CEQA Guidelines, § 15063, subd. (a).)

Depending on the initial study's findings, the agency must then prepare either an EIR, a mitigated negative declaration, or a negative declaration. If "there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency need only prepare a negative declaration that "briefly describ[es] the reasons that a proposed project . . . will not have a significant effect on the environment." (CEQA Guidelines, §§ 15063, subd. (b)(2), 15371.) If substantial evidence shows the project may in fact have a significant environmental effect, but the project applicant agrees to changes that would avoid or mitigate them, then the agency may instead prepare a mitigated negative declaration. (CEQA Guidelines, § 15070, subd. (b).) And if substantial evidence shows the project may have a significant environmental effect and a mitigated negative declaration is inappropriate, as is true in this case, then the agency must prepare an EIR providing detailed information about the project's potential environmental impacts. (Pub. Resources Code, §§ 21100 [state agency requirements], 21151 [local agency requirements], 21061 [defining an EIR].)

An EIR, as courts have often said, is " " 'the heart of CEQA." ' " (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511.) It serves to "(1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project." (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488.) To fulfill these purposes, an "EIR 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Cleveland National Forest Foundation*, at p. 511.) But that

5

does not mean an EIR must be exhaustive on all topics. Courts look " 'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' [Citation.]" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1175.)

In reviewing an agency's compliance with CEQA, courts review for abuse of discretion. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) Courts will find an agency abused its discretion if it either failed to proceed in a manner required by law or reached a decision not supported by substantial evidence. (*Ibid.*) " 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task is "not to weigh conflicting evidence and determine who has the better argument." [Citation.]' [Citation.]" (*Ibid.*)

This distinction between de novo review and substantial evidence review is often straightforward. A contention that an agency has, for example, provided an insufficient amount of time for public comment is subject to de novo review. And a contention that an agency's factual findings are wrong, as a different example, is subject to substantial evidence review. But questions about the relevant standard of review are not always so clear. "This is especially so when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' [Citation.]" (*Sierra Club*, *supra*, 6 Cal.5th at p. 513.) Those types of "inquir[ies] present[] a mixed question of law and fact" and are "generally subject to independent review." (*Id.* at p. 516; see *id.* at p. 514 ["whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of

6

the impact is not a substantial evidence question"].)  But if "factual questions predominate, a more deferential standard is warranted."  (*Ibid.*)

With those principles in mind, we turn to Sierra Watch's arguments.

II

*The Lake Tahoe Basin*

A.  *Description of the Environmental Setting*

Sierra Watch's first argument concerns the EIR's discussion of the project's "environmental setting."

An agency must, in its EIR, "include a description of the physical environmental conditions in the vicinity of the project," which is referred to as the project's "environmental setting."  (CEQA Guidelines, § 15125, subd. (a).)  This description of the environmental setting often focuses on the existing environmental conditions in the immediate vicinity of the project.  But because "[k]nowledge of the regional setting is critical to the assessment of environmental impacts," this description should also place "[s]pecial emphasis . . . on environmental resources that are rare or unique to that region and would be affected by the project."  (CEQA Guidelines, § 15125, subd. (c).)  The agency must normally then use this description of the existing environmental setting as the " 'baseline' against which predicted effects [of the project] can be described and quantified."  (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447; see CEQA Guidelines, § 15125, subd. (a) ["This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."].)

In Sierra Watch's view, the EIR's discussion of the environmental setting was inadequate because it failed to "meaningfully address[] the [Lake] Tahoe Basin."  In particular, Sierra Watch alleges, "the chapters on water quality and air quality setting, where readers would expect this information, barely touch on the subject."  We agree in part.

7

1. *Lake Tahoe and the EIR's Discussion of Water Quality*

We start with the EIR's discussion of Lake Tahoe and water quality. All parties appear to accept that Lake Tahoe is a unique and significant environmental resource that would be affected by the project. It is, as the United States Supreme Court has noted, " 'uniquely beautiful' " and a " 'national treasure' " famous for its water's "exceptional clarity." (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 307.) It is also, as all parties here acknowledge, a resource that would be affected by traffic generated by the project — though the parties disagree on the extent of that effect. Because of these considerations, the CEQA Guidelines instruct, the County should have placed "[s]pecial emphasis" on Lake Tahoe in its discussion of the environmental setting. (CEQA Guidelines, § 15125, subd. (c) ["Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project."].)

But, as Sierra Watch argues, the County's EIR never meaningfully discussed Lake Tahoe in its description of the environmental setting. In its discussion of the environmental setting for "Hydrology and Water Quality," the draft EIR offered only one parenthetical reference to Lake Tahoe, stating: "The plan area is located within the low elevation portion of the approximately eight square mile Squaw Creek watershed, a tributary to the middle reach of the Truckee River (downstream of Lake Tahoe)." Nowhere in this sentence, or elsewhere, did the draft EIR discuss the importance of Lake Tahoe, its characteristics, or its current condition.

After Sierra Watch commented about the draft EIR's "fail[ure] to adequately describe the Tahoe regional setting," the final EIR, in response, directed Sierra Watch to "[s]ee the Master Response regarding TRPA Thresholds." TRPA is the Tahoe Regional Planning Agency and is "the agency assigned 'to coordinate and regulate development in the [Lake Tahoe] Basin and to conserve its natural resources.' [Citation.]" (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, *supra*, 535 U.S. at

8

p. 309.)  According to the final EIR's "Master Response regarding TRPA Thresholds," TRPA tracks vehicle miles traveled (VMT) in the Lake Tahoe Basin and has established a cumulative "VMT threshold of 2,067,600" for the basin.  And, the final EIR went on, although cumulative VMT in the basin is nearing this threshold, estimated to be 1,984,600 VMT in the summer of 2010 (or at about 96% capacity), the project's anticipated contribution to VMT in the basin (23,842 VMT on busy summer days) would not cause an exceedance of TRPA's cumulative threshold.

But little in that discussion addressed the shortcomings in the draft EIR.  Like the draft EIR, the final EIR still never discussed the importance of Lake Tahoe or its current condition.  It instead largely appeared to presume that Lake Tahoe needed no introduction, and so little needed to be said about it.  And although the final EIR at least offered some figures about current and anticipated VMT around Lake Tahoe, it never clearly explained how all these figures related to the lake.  The County instead only acknowledged the connection between VMT and Lake Tahoe's clarity after the final EIR was prepared, revealing six days before the board of supervisors approved the project that increased "VMT and its related effects — tailpipe emissions and crushed abrasives — have a direct role in lake clarity."  But none of that was disclosed in the EIR.  And so when the final EIR acknowledged the project would significantly increase traffic in the basin — adding, again, an estimated 23,842 VMT in the basin on busy days — the public had little if any ability to evaluate the relevance of that change to Lake Tahoe.  That was improper.  (See *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 954-955 [finding inadequate an EIR that only superficially described the existing condition of several lakes that would be impacted by a project; the EIR's discussion, which focused only on lake levels, undermined the agency's ability "to assess the impacts of the proposed project"]; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1122 [finding inadequate an EIR that omitted a meaningful discussion of the regionally important vineyards and wineries that

9

surrounded a project; "[d]ue to the inadequate description of the environmental setting for the project, a proper analysis of project impacts was impossible"].)

The County, its board, Squaw, and Squaw Valley Resort LLC (collectively, respondents), attempting to address these shortcomings, assert that the draft EIR's "Hydrology and Water Quality chapter . . . noted that Lake Tahoe is a significant geographical feature in the region." But that chapter of the EIR, again, said only this about Lake Tahoe: "The plan area is located within the low elevation portion of the approximately eight square mile Squaw Creek watershed, a tributary to the middle reach of the Truckee River (downstream of Lake Tahoe)." No reader of that language could reasonably interpret it to "note[] that Lake Tahoe is a significant geographical feature in the region." Respondents' contrary position, like the EIR's analysis, simply appears to presume that Lake Tahoe is a known quantity and so the mere mention of the lake is sufficient to convey all that is necessary. It is not.

Respondents also challenge the need for a more robust discussion of Lake Tahoe in the environmental setting. No additional discussion was required, they reason, because "[t]he Project did not propose development in the Tahoe Basin . . . and would not result in stormwater runoff or other pollutants draining into the lake." But respondents' first point about the location of the development ignores the "critical" importance of the regional setting. Again, as the CEQA Guidelines instruct, "[k]nowledge of the regional setting is critical to the assessment of environmental impacts." (CEQA Guidelines, § 15125, subd. (c); see *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 575 (*Citizens of Goleta Valley*) ["an EIR may not ignore the regional impacts of a project proposal, including those impacts that occur outside of its borders; on the contrary, a regional perspective is required"].) Respondents' second point is less persuasive still. They argue the project "would not result in stormwater runoff or other pollutants draining into the lake," but their own post-EIR responses suggest otherwise. In these responses, the County plainly demonstrated that increased VMT resulting from the

10

project would increase the amount of pollutants draining into Lake Tahoe. The County noted, for example, that "abrasives" applied to roads around Lake Tahoe "can be crushed by tires and washed into the lake by stormwater runoff." And in part for that reason, the County explained, increased VMT in the basin has a "direct role in lake clarity" because it is associated with an increased amount of these abrasives (which are pollutants) washing into the lake. (See *People v. Ramsey* (2000) 79 Cal.App.4th 621, 629 ["Concrete, rebar, sand, and similar waste materials are pollutants" under state and federal water law].)

Respondents lastly, on the topic of VMT, contend "the EIR addressed the issue at length." To make this showing, respondents cite two parts of the EIR. One part noted that "TRPA maintains several environmental carrying capacities pertaining to traffic," including one concerning VMT "for the entire basin." (See Gov. Code, § 66801, subd. (b) [TRPA has "the power to establish environmental threshold carrying capacities and to adopt and enforce a regional plan and implementing ordinances that will achieve and maintain such capacities. . ."].) Another part, which we have discussed, noted that VMT in the summer of 2010 was estimated to be 1,984,600 per day in the basin, the project would add an estimated 23,842 VMT per day, and, putting these two figures together, total daily VMT under project conditions would be 2,008,442 VMT and thus lower than TRPA's cumulative threshold of 2,067,600 VMT. But neither of these portions of the EIR discussed or even intimated any relationship between VMT and Lake Tahoe's clarity and water quality. Nor did either of these portions of the EIR supply any description of the lake. And so, again, when the final EIR acknowledged the project would significantly increase traffic in the basin, the public had little if any ability to evaluate the relevance of that change to Lake Tahoe. We find the EIR was inadequate as a result. (See *Galante Vineyards v. Monterey Peninsula Water Management Dist.*, *supra*, 60 Cal.App.4th at p. 1122; see also *Sierra Club*, *supra*, 6 Cal.5th at p. 521 [finding inadequate an EIR that "ma[de] it impossible for the public to translate the bare numbers

11

provided into adverse health impacts or to understand why such translation is not possible at this time (and what limited translation is, in fact, possible)"].)

2. *The Lake Tahoe Basin and the EIR's Discussion of Air Quality*

We turn next to the EIR's discussion of the Lake Tahoe Basin and air quality.

The draft EIR's discussion of baseline air quality conditions was a little more substantial. Among other things, it noted that the federal Environmental Protection Agency and state Air Resources Board have established air quality standards for six so-called "criteria air pollutants": ozone, carbon monoxide, nitrogen oxides, sulfur oxides, lead, and particulate matter (of which there are two relevant types: respirable particulate matter (or $PM_{10}$), which has a diameter of 10 micrometers or less, and fine particulate matter (or $PM_{2.5}$), which has a diameter of 2.5 micrometers or less). It also explained that concentrations of these pollutants "are used as indicators of ambient air quality conditions," noted that vehicle traffic is one of the main sources for many of these pollutants, and then summarized air quality data from 2011 to 2013 from four monitoring stations in and around the Lake Tahoe Basin. The final EIR later added, as we have discussed, that the project is expected to result in increased vehicle traffic in the Lake Tahoe Basin (with an estimated daily addition of 23,842 VMT on busy days), supplied data about existing vehicle traffic from the summer of 2010 (estimated daily VMT of 1,984,600), and noted TRPA's cumulative threshold for VMT in the basin (2,067,600 VMT).

Sierra Watch challenges this discussion for several reasons, principally faulting the draft EIR for not discussing the "bi-state regulatory regime that governs the Basin," the basin's "environmental carrying capacity," or "VMT in the Basin." But all these objections appear to have been resolved in the County's responses in the final EIR. In these responses, the County discussed the agency with "jurisdiction over all development within the Basin in both California and Nevada" (namely, TRPA), described TRPA's "environmental carrying capacity" for vehicle traffic (namely, its cumulative threshold of

12

2,067,600 VMT), and noted current daily VMT in the basin and anticipated daily cumulative VMT with the project. Sierra Watch never, in its opening brief, explains why these responses were insufficient. It instead waits until its reply brief to complete its argument, saying there that the new information in the final EIR "came too late in the administrative process" and was insufficient to understand the project's impacts on the basin's air quality. But because Sierra Watch raises these arguments for the first time in its reply brief, we find them forfeited. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

Sierra Watch also contends the draft EIR's discussion of the environmental setting failed to "describe the current air quality conditions" in the basin and instead "merely references data from two monitoring stations in the Basin." But Sierra Watch never explains why the County's summary of data about the basin's air quality conditions (which came from three, not two, monitoring stations in the basin) failed to sufficiently "describe the current air quality conditions." Perhaps Sierra Watch had a reasonable point to make here, but because it failed to explain itself, we treat the point as forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

Finally, in terms of the environmental setting, Sierra Watch asserts that more information was required to supply "complete information on this environmental setting." But it never identifies the type of information it believes is lacking and, in any event, it asks for too much in seeking "complete information." As courts have long made clear, an EIR " ' "need not include all information available on a subject." ' " (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 639; see also *In re Bay-Delta*, *supra*, 43 Cal.4th at p. 1175 [courts look " 'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure' "].)

13

B. *Consideration of Impacts*

Sierra Watch next, still on the topic of Lake Tahoe Basin, contends the EIR failed to "meaningfully assess[] the Project's [traffic] impacts on" Lake Tahoe and the basin's air quality. We agree.

The EIR provided mixed messages on the project's potential impacts to Lake Tahoe and the basin from increased traffic. On the one hand, it said the project would not result in an exceedance of TRPA's cumulative VMT threshold for the Lake Tahoe Basin. But on the other hand, it showed the project would likely exceed TRPA's project-level threshold of significance for traffic in the basin. The EIR noted that TRPA has not consistently applied any particular threshold when evaluating project-level impacts, but, after reviewing several EIRs from TRPA, it found two "used a daily trip generation threshold of 200 trips as a significance threshold," one "used a criterion of 1,150 VMT as a significance threshold," and another used a flexible significance criterion that considered whether an increase in VMT would be "substantial in relation to the [cumulative] VMT threshold standard." Under the first two thresholds of significance — the VMT and daily-trip thresholds — the project here would plainly have a significant impact. It would result in daily VMT over 2,000 percent above the 1,150-VMT threshold and daily trips over 500 percent above the 200-daily-trip threshold.[3] But under the third described threshold of significance, which eschewed a numerical threshold in favor of a more flexible standard focused on "substantial" increases in VMT, the significance of the project's impacts is less straightforward. We can note, however, that the project would

---

[3] The EIR, at one point, said the project would generate about 1,353 daily trips into the basin. But later on, it suggested the trips into the basin would actually be somewhat lower because a measure intended to address transit impacts would expand transit services. It never, however, estimated the potential reduction in daily trips resulting from this mitigation measure.

14

increase daily VMT in the basin by about 1.2 percent and would reduce the available VMT capacity under TRPA's cumulative threshold by about 28.7 percent.[4]

Rather than follow one of TRPA's approaches, however, the EIR simply declared that TRPA's thresholds were inapplicable because the project is not located in the basin. But if TRPA standards were inapplicable, what standards did apply? The EIR never answered the question. Nor did it supply any meaningful information to evaluate the significance of a daily addition of 23,842 VMT on Lake Tahoe's water quality and the basin's air quality. Nor did it even offer any clear conclusion on whether this additional traffic would significantly impact Lake Tahoe and the basin. It instead simply supplied some discussion about TRPA's thresholds of significance and then said "the TRPA thresholds are not used as standards of significance in this EIR."

We find this discussion inadequate. The EIR needed to determine whether the project's impacts on Lake Tahoe and the basin were potentially significant — not simply summarize, and then declare inapplicable, another agency's framework for evaluating these types of issues. Even supposing the EIR actually reached a conclusion about the project's impacts, we would still find it defective. Under CEQA, an agency's conclusion as to whether a given impact is significant is not enough; "there must [also] be a disclosure of the 'analytic route the . . . agency traveled from evidence to action' " — something that never occurred in the EIR here. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 404.)

Making matters worse, the EIR's offered figures on VMT underestimated expected cumulative VMT in the basin. The final EIR, again, said that cumulative VMT

---

[4]    Absent the project, TRPA's cumulative threshold allowed room for 83,000 additional VMT (2,067,600 VMT - 1,984,600 VMT = 83,000 VMT). But with the project, which would add 23,842 VMT, that capacity would fall to 59,158 VMT — or by about 28.7 percent.

in the summer of 2010 were 1,984,600 and the addition of the project's estimated VMT would push that cumulative figure to 2,008,442 in the future. But in reaching these figures, the EIR improperly ignored the expected addition of VMT from other anticipated projects, including another large development the County was itself considering approving. (See CEQA Guidelines, § 15065, subd. (a)(3) [in determining whether a project's impacts are "cumulatively considerable," agencies must consider "the incremental effects of an individual project . . . in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects"].)

Although the County eventually, after the final EIR was prepared, recognized its failure to account for the expected addition of VMT from other projects and acknowledged the "important" connection between VMT and Lake Tahoe, its belated discussion of these issues came too late. Six days before the County's board of supervisors certified the EIR, and several months after the preparation of the final EIR, the County provided additional information about the project's impact on Lake Tahoe's water quality. In these post-EIR responses, the County acknowledged for the first time that "[t]he connection between VMT and Lake clarity is important, as vehicle emissions and roadway fires are known contributors to loss of clarity." It also acknowledged the connection between VMT and air quality, explaining that TRPA has historically "linked higher VMT to," among other things, "increased airborne concentrations of particulate matter that could affect regional and subregional visibility and human health." And, at least implicitly, it acknowledged too that the EIR's calculation of expected cumulative VMT in the basin should not have ignored the expected VMT from other anticipated projects.

After acknowledging these issues and updating its VMT estimates, the County then explained why, in its view, the increased traffic resulting from the project would not adversely impact Lake Tahoe or the basin. To start, the County wrote, "a direct link

16

between a specific number of VMT and attainment of Lake clarity goals has not been established," and, as a result, even TRPA has acknowledged the need to further evaluate the relationship between the two. In addition, based on its review of an EIR prepared for a different project, the County opined that technological advances emphasize the need for further evaluation of TRPA's standards. According to the County, improvements in technology since TRPA established its VMT thresholds — including improvements in limiting stormwater runoff into the lake and reducing tailpipe emissions — could mean that TRPA's thresholds, which were initially developed decades ago, are now outdated. Given these considerations, the County concluded, because "the relationship between a specific VMT and lake clarity is not well understood," and because the "addition of the project's VMT to existing Tahoe Basin VMT would not be significant even if the [arguably outdated] TRPA VMT threshold was used as a threshold of significance for project impacts," the final "EIR conclusion is accurate and supported by evidence in the record."[5]

All this information, however, came far too late in the CEQA process. CEQA requires agencies to discuss a project's potentially significant impacts in the draft EIR and final EIR. (CEQA Guidelines, § 15120, subd. (c); see also *id.*, §§ 15125, 15126.2.) And to the extent an agency omits an adequate discussion of a project's potential impacts in its EIR, it cannot afterward "make up for the lack of analysis in the EIR" through post-EIR analysis. (*Save our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, 130 [project information revealed in an "[e]rrata" shortly

---

[5] On this logic, a project that added 82,999 daily VMT to the basin would have an insignificant impact because total estimated VMT (which would now be 2,067,599) would remain one VMT below the cumulative threshold of 2,067,600 VMT; yet the next project, even if it added only 10 daily VMT to the basin, would result in an exceedance of the cumulative threshold and thus have a significant impact. Perhaps that is a supportable conclusion. Perhaps not. We need not address this issue here.

before project approval "d[id] not make up for the lack of analysis in the EIR"].)  To find otherwise, after all, would deny the public "an 'opportunity to test, assess, and evaluate the [newly revealed information] and make an informed judgment as to the validity of the conclusions to be drawn therefrom.'  [Citation.]"  (*Id.* at p. 131; see also *Cleveland National Forest Foundation v. San Diego Assn. of Governments*, *supra*, 3 Cal.5th at p. 511 [an EIR must itself " 'include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project' "].)

Respondents never appear to argue otherwise on this last point.  They instead contend the County's post-EIR responses only "elaborated on and confirmed" information in the EIR.  But we find differently.  Again, in these post-EIR responses, the County acknowledged and analyzed, apparently for the first time, the potential impacts from the project's generation of an additional 23,842 VMT per day in the Lake Tahoe Basin.  In this way, these responses did not merely elaborate on and confirm the EIR's conclusions; they instead supplied critical analysis and conclusions that were initially absent from the EIR.

Sierra Watch, apart from challenging the County's ability to rely on these late responses, also contends these post-EIR responses were substantively flawed for several reasons.  But the alleged inadequacy of the County's post-EIR comments are beside the point under CEQA, as "the inadequacy of [an agency's] responses to . . . comments [on the final EIR] is not sufficient to render approval of the CEQA Project ineffective or contrary to law."  (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1111.)  And so, although we agree the EIR's analysis was flawed, we will not separately address the alleged inadequacy of these post-EIR comments.

## III

### *Wildfire Impacts*

Turning to wildfire impacts, Sierra Watch, for eight reasons, contends the EIR failed to "adequately analyze the obvious fire risks created by the Project." We agree with one of its arguments.

Agencies performing review under CEQA must, relevant here, analyze "any potentially significant direct, indirect, or cumulative environmental impacts of locating development in areas susceptible" to "wildfire" and other "hazardous conditions." (CEQA Guidelines, § 15126.2, subd. (a).) In performing this review, the CEQA Guidelines instruct, agencies may consider among other topics whether the project would "[i]mpair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan." (CEQA Guidelines, § 15063, subd. (f); *id.*, Appendix G, VIII, g.)

To comply with this requirement, the draft EIR here considered, among other things, whether the project would impair implementation of an emergency evacuation plan. It found it would. The fire evacuation protocol applicable to all development in Olympic Valley, the draft EIR noted, "calls for evacuating via Squaw Valley Road to [State Route (SR)] 89; or, if it is not possible to leave the Valley, driving to the Squaw Valley Ski Resort parking lot." But, the draft EIR said, lane closures and increased traffic expected during project construction "could cause or contribute to temporary increases in traffic levels" and could, as a result, "interfere" with this evacuation protocol. To address this potentially significant impact, the draft EIR required the preparation of a "Construction Traffic Management Plan" as mitigation.

After commenters faulted the draft EIR for failing to evaluate an evacuation scenario under peak traffic conditions, the County offered further analysis in the final EIR. It commissioned a consultant that found the project would, under conservative estimates and peak traffic conditions, increase the time it took for all vehicles to leave

19

Olympic Valley from 2.9 hours to 5 hours — an increase of over 70 percent. And considering other expected development in the region, the consultant found the time for evacuation would increase to 6.6 hours and, in a worst-case scenario, to 10.7 hours. But the final EIR discounted the likelihood of this occurring, saying the time estimates were based on several "highly unlikely" assumptions, including "that 100 percent of all homes and lodging in Olympic Valley would be occupied at any one time" and "that the entire Valley would be at risk simultaneously." It then noted that several considerations should allow for a more orderly evacuation in the event a large-scale evacuation were necessary. First, the EIR said, authorities could often be expected to order the evacuation well before the fire neared Olympic Valley because "[d]ays of lead time are often available to assess risk and make evacuation determinations." And second, it added, even "[i]f a wildfire ignited in or near Olympic Valley required a more rapid response, there are shelter in place options (e.g., parking areas, buildings designed for fire resistance, the golf course) that are distant from fire fuels and that can temporarily hold people as an evacuation proceeds." But, the EIR went on, a large-scale evacuation with "the entire Valley . . . at risk simultaneously" was "highly unlikely"; "[t]he more likely scenario is that evacuation orders would encompass only the parts of the Valley at high risk, and a complete rapid Valley evacuation would not be needed."

Sierra Watch challenges the County's analysis on several grounds. First, it contends the County's estimation of "a 5- to 10.7-evacuation time by itself constitutes evidence of a significant impact, given the ability of a wind-driven fire to consume the Project area in just a few hours." In support, it references a 2014 fire that, according to the fire chief for the Squaw Valley Fire Department (the Fire Department), made a "10 mile northward run during the course of a few hours one night." We reject the argument. Even if the referenced 2014 fire traveled 10 miles over one night, nothing in the record shows that this fire occurred in an area comparable to the project area or Olympic Valley. The 2014 fire, notably, never reached Olympic Valley. And although the location of that

fire was perhaps conducive to rapid spread, the record contains substantial evidence about the difficulty of a fire to spread in Olympic Valley. According to the Fire Department's fire chief, for example, "[Olympic] Valley is pretty favorable in terms of fuels and topography and the unlikely host event for a large wildland fire." He explained that, surrounding the developed area, "fuels are pretty discontinuous," "large areas . . . are basically open rock," and "lots of ski runs that are relatively low, grassy vegetation give us an opportunity to interrupt the fire[']s . . . progress and try to control it before it reaches the developed area." He added that, in most of the developed area and immediately surrounding it, "there is a significant amount of clearance between the forested area, the heaviest fuel loads[,] and the areas that are developed for commercial use." "So because of that," he concluded, "my feeling is that a mass evacuation of [Olympic] Valley is a very, very, very unlikely event."

Considering this evidence, together with our deferential review of an agency's factual findings and its established thresholds of significance, we decline to conclude that the EIR's estimation of "evacuation time by itself" required the County to find the project's potential impacts significant. (See *Sierra Club*, *supra*, 6 Cal.5th at p. 512 [a " 'reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task is "not to weigh conflicting evidence and determine who has the better argument" ' "]; *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1068 ["CEQA grants agencies discretion to develop their own thresholds of significance"].)

Second, Sierra Watch contends the EIR is internally inconsistent in finding "the Project would cause significant traffic during non-emergency conditions" but would not "do so during an emergency evacuation." We disagree here too. The EIR, in its discussion of transportation-related issues, said project-generated traffic would lead to more traffic delays and higher traffic volumes in certain areas during "summer Friday

21

p.m. peak hour" conditions. And it found these changes were enough to be considered significant traffic impacts. But this conclusion, in a part of the EIR discussing transportation-related issues, did not obligate the County to also find, in a separate part of the EIR discussing fire-related issues, that impacts to emergency evacuation plans would also be significant. Whether a given impact is significant depends on the context. An agency, for example, might find a traffic delay of 2.5 seconds significant in some contexts when considering impacts to traffic conditions (as the County did here), and, without being fatally inconsistent, also find a similar delay insignificant when considering impacts to emergency evacuation plans. Or to put it differently, as the EIR here indicated, an agency might find *time* the sole relevant consideration when evaluating impacts to traffic conditions, but then find *public safety* the guiding consideration when evaluating impacts to emergency evacuation plans. Again, the context matters. And Sierra Watch has not shown the County abused its discretion merely because its thresholds of significance for fire-related impacts were not equivalent to its thresholds of significance for transportation-related impacts. (*Save Cuyama Valley v. County of Santa Barbara*, *supra*, 213 Cal.App.4th at p. 1068 ["CEQA grants agencies discretion to develop their own thresholds of significance"].)

Sierra Watch's one cited case in support of its position, *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 300 (*East Sacramento Partnerships*), does not say differently. In Sierra Watch's telling, we held there "that a finding of traffic significance outside a city's core area belies a finding of insignificance inside the core area under similar conditions." But our holding was more complicated than that. The EIR there was not defective simply because it treated traffic impacts outside and inside the city's core area differently. Indeed, as we noted, " 'the significance of an activity may vary with the setting.' [Citation.]" (*Id.* at p. 302.) The EIR was defective, instead, because it presumed that impacts permitted under the city's general plan were necessarily insignificant impacts. According to the EIR, because

22

the city's general plan permitted " 'stop and go' " traffic in the city's core area, a project that increased traffic to stop-and-go levels in that area would not have a significant impact — no matter what the other evidence showed. (*Id.* at pp. 300, 302.) But, as we explained, that a general plan allows certain impacts does not relieve an agency of its obligation to consider substantial evidence indicating that these impacts may still be significant. (*Id.* at pp. 302-303; see also CEQA Guidelines, § 15064, subd. (b)(2).) None of this reasoning, however, furthers Sierra Watch's argument here. Unlike in *East Sacramento Partnerships*, the County here did not conflate permissible impacts under a general plan with insignificant impacts. And the County was not, as discussed, required to apply the same thresholds of significance when considering two very different types of issues.

Third, Sierra Watch asserts the County failed to disclose two "crucial" documents. The first is a memorandum from one of the County's consultants that provided the estimated evacuation times discussed above. According to Sierra Watch, the County neither provided the memorandum nor offered "a comprehensive summary of its underlying assumptions or data." But we find no inadequacies here. First, an agency need not provide copies of all sources it relies upon in its EIR. (CEQA Guidelines, § 15148.) And second, although Sierra Watch claims the County withheld relevant assumptions or data from the memorandum, it never explains why it believes that to be the case. We thus treat the point as forfeited. (See *Badie*, *supra*, 67 Cal.App.4th at pp. 784-785 ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

Sierra Watch similarly contends the final EIR is inadequate because it noted that Squaw was preparing an "Emergency Preparedness and Evacuation Plan" (Evacuation Plan) but did not include a copy of the plan. It reasons that, under CEQA, "information essential to the environmental analysis must appear in the EIR itself." But the EIR summarized the type of information that would be included in the Evacuation Plan and,

23

in the end, much of the information included in the Evacuation Plan about evacuation procedures was in fact included in the EIR. Both the EIR and the Evacuation Plan, for example, discussed procedures for exiting Olympic Valley during an evacuation and both, in the event evacuation was not possible, said guests could shelter in place in parking areas and buildings designed for fire resistance. The Evacuation Plan, we acknowledge, includes more information on evacuation than the EIR. But Sierra Watch never explains why the additional information included in the Evacuation Plan was, as it alleges, "information essential to the environmental analysis" in the EIR. Nor does it allege that the EIR even relied on the Evacuation Plan in its environmental analysis. It instead asserts only that the final "[]EIR *notes* that [Squaw] 'is preparing' an Emergency Preparedness and Evacuation Plan." But that is not enough to show error.

Fourth, Sierra Watch contends the EIR underestimated evacuation times because it wrongly assumed emergency responders would provide traffic control at key intersections. On this point, we agree. In estimating evacuation times, the County's consultant assumed, among other things, that emergency responders would "provide traffic control at key intersections." It did so, the consultant explained, "[p]er direction from" the Fire Department's fire chief. But the fire chief later wrote that the opposite was true — his department specifically advised the consultant that this assumption was "highly unrealistic" because "[a]ny available public safety personnel would be tasked with much higher priority tasks and even then, the numbers of public safety personnel would likely be inadequate." The County's consultant thus, it seems, estimated evacuation times in part based on a miscommunication with the Fire Department. And the upshot of this misunderstanding was that the consultant (and the EIR) underestimated evacuation times in the event of an evacuation.

We find this underestimation to be significant. The County, notably, acknowledged that increased traffic along Squaw Valley Road and State Route 89 could, at some point, significantly interfere with emergency evacuation plans. That

24

consideration led it to conclude that increased traffic from project construction would significantly interfere with emergency evacuation plans — though, for some reason, it found differently when considering increased traffic from project operations (that is, traffic from guests and employees). Its reason for treating increased traffic from project construction and increased traffic from project operations differently is not entirely clear from the record — which is perhaps an issue in itself. But it is clear at least that, at some level of congestion, the County believed increased traffic along Squaw Valley Road and State Route 89 would significantly interfere with the implementation of evacuation plans. And it is also clear that, with the County arguably close to finding that increased traffic from project operations could be significant, the EIR's accidental misrepresentation of estimated evacuation times prevented the County's board and the public "from gaining a true perspective on the consequences of approving the[] project[]." (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 80.)

Attempting to downplay this issue, respondents note that the Fire Department's fire chief ultimately supported the evacuation plan prepared for the project (the Evacuation Plan), and so, they suggest, we need not concern ourselves with his objections about the EIR's calculation of evacuation times. But whether the fire chief accepted the evacuation plan or not, the EIR's misleading estimation of evacuation times is still that — a misleading estimation of evacuation times that prevented informed decisionmaking. We find the EIR inadequate in this respect as a result.

Fifth, Sierra Watch asserts that the EIR, in estimating evacuation times, wrongly considered only the time necessary to reach State Route 89. In its view, the EIR should have also considered the time necessary to reach the intersection of State Route 89 and Interstate 80, about nine miles north of Olympic Valley, because these nine miles of State Route 89 are "regularly gridlocked" and lie "in a heavily forested canyon that is also a high fire severity zone." But Sierra Watch cites little in the record to support its argument. It neither shows that the relevant portion of State Route 89 lies "in a heavily

25

forested canyon" nor shows that this area, apart from a small portion of State Route 89 that borders the project, is a "high fire severity zone." We reject its largely unsupported argument as a result.

Sixth, Sierra Watch faults the EIR for "fail[ing] to estimate response times for emergency personnel to access the Project site during a wildfire evacuation" — information it deems "essential" to evaluate the project's impacts. We reject the argument. The EIR noted that emergency personnel currently provide services to Olympic Valley, including during peak traffic levels, and it found that "the proposed project [would] cause[] little change from the existing condition." It reasoned that "[r]oadway emergency access would . . . continue to be ensured through various methods, such as emergency vehicles driving on the road shoulder as needed, or traffic control personnel (typically present during peak traffic periods) moving cars to the edge of the roadway ahead of the emergency vehicle." A new fire substation on the west end of Olympic Valley, the EIR went on, would further minimize any potential impediment to emergency vehicle access. One of the mitigation measures for the project requires this substation to be operational once 50 percent of the project's "condo hotel units" are completed, and, according to the EIR, this substation would "provide the opportunity to have emergency response personnel and equipment in the west end of the Valley, reducing the potential for traffic on Squaw Valley Road to influence emergency response."

Considering these findings, which Sierra Watch never even acknowledges in its opening brief, we decline to find it was "essential" for the County to estimate response times for emergency personnel. Quantitative analyses are often helpful and at times necessary, to be sure; but Sierra Watch has not shown a quantitative analysis was necessary here. As our high court has explained, "[a] project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information." (*Laurel Heights Improvement Assn. v. Regents of University of California*,

26

*supra*, 47 Cal.3d at p. 415.)  But "[i]t is not for them to design the EIR" and "[t]hat further study . . . might be helpful does not make it necessary."  (*Ibid.*)

Seventh, Sierra Watch contends the EIR's conclusions relied on the improper assumption "that evacuations would proceed in an orderly fashion and often have '[d]ays of lead time.' "  Its objection relates to the EIR's statement that emergency personnel often have "[d]ays of lead time" after learning of a potential fire risk and so often could, if appropriate, issue early evacuation orders.  As Sierra Watch notes, the Fire Department's fire chief debated that conclusion in a written comment.  According to his letter, although "it might be semantically accurate to say that there are 'days of lead time' available to assess risk and model potential fire behavior and evacuation scenarios, evacuation of a community is rarely the calm, orderly picture that [the EIR supposes]. People are reluctant to leave and tend to do so at the last minute when emotions are high and conditions are terrible."  But although, as these comments show, the fire chief initially challenged the EIR's findings, he later warmed up to them.  On the day of the hearing for the project, he again said people often deny the risk from fire initially and then leave at the last minute.  But he then expressed confidence in his department's ability to better communicate fire risks in the future to address this problem.  Considering the whole of the fire chief's comments, we decline to find that they show the EIR's conclusions to be improper.

Finally, Sierra Watch attacks the EIR's reliance on shelter-in-place options during a fire, asserting that "[s]heltering in place during a wildfire in a 'very high fire severity zone' unquestionably exposes people to serious safety risks."  We reject the argument. According to the EIR, several shelter-in-place options for the project — including "buildings designed for fire resistance" — would allow people to stay "distant from fire fuels" and thus distant from any fire.  Squaw's consultant added that these buildings would be designed "to serve that function, not just for our guests, but for others in the Valley in the event that ever becomes necessary."  And the Fire Department's fire chief,

27

expressing support for sheltering in place, said "sheltering in place is a very, very favorable way of approaching the situation in [Olympic] Valley." This favorable view of sheltering in place is presumably why this tactic was, even before the County approved the project, a central component of the "established *Wildland Fire Evacuation Plan*" that "applies to all development in [Olympic] Valley."

Attempting to counter these findings, Sierra Watch suggests that those sheltering in place could be exposed to "poor air quality" during a fire and then faults the EIR for failing to analyze this potential impact. But many of the shelter-in-place options described in the EIR are, again, buildings designed for fire resistance, and Sierra Watch cites nothing in the record suggesting that poor air quality following a fire could adversely affect those sheltering in these buildings. Nor does it allege or suggest that these buildings would have insufficient capacity to house those sheltering in place in the event of a fire. Nor does it acknowledge that sheltering in place was a central part of the evacuation plan in place for Olympic Valley even before the project. Nor, finally, does it show that this issue was even raised at the administrative level. It instead simply presumes that "[s]heltering in place during a wildfire in a 'very high fire severity zone' unquestionably exposes people to serious safety risks," like exposure to poor air quality. But because Sierra Watch has not made a sufficient showing of this alleged risk for the project area, we decline to find the EIR inadequate in this respect. (See *Friends of Riverside's Hills v. City of Riverside* (2018) 26 Cal.App.5th 1137, 1152 ["evidence of environmental impacts must be founded upon *facts* in the administrative record, it cannot be based on '. . . speculation' "].)

IV

*Noise Impacts*

Sierra Watch next contends the EIR failed to adequately analyze and mitigate construction noise impacts. Although we reject most of its arguments, we agree the EIR's analysis and mitigation of construction noise impacts are inadequate.

28

A. *Analysis of Impacts*

We start with Sierra Watch's several arguments concerning the EIR's analysis of construction noise impacts.

First, Sierra Watch asserts, "the EIR does not disclose the duration of construction noise at any specific location" and is improper for that reason. We reject the argument. To begin, the EIR did disclose the duration of construction noise for at least part of the project. It estimated that construction time for the East Parcel, a relatively small part of the project where employees would be housed, would take between 24 and 30 months. But that said, it is at least true that the EIR did not estimate the duration of construction noise for the Village, which involved the bulk of the project.

Even so, we decline to find the EIR inadequate for that reason. The EIR sufficiently demonstrated why specific detail about the duration of construction noise at each specific location in the Village was not possible. The project would be constructed over 25 years. It included no specific plan on where buildings would be located, opting instead for "flexibility regarding the placement and design of individual buildings." It included no "specific construction schedule" because the "sequence and pace for constructing various land uses and facilities would be market driven." And it emphasized the potentially sporadic pace of development, noting that some years may have no construction and other years, in contrast, may involve simultaneous construction of several "elements" of the project. For these types of reasons, the EIR explained, "it would not be practical, and would require a great deal of speculation, to identify specific noise levels for every single receptor."

Sierra Watch appears to acknowledge, without objection, that these considerations make the sequence and pace of construction largely unknown, but it maintains that the EIR at least should have described the duration of construction for each part of the project. We find differently. The County perhaps could have speculated how long construction noise would occur over the next 25 years at each specific location in the

29

Village. Perhaps, for example, it could have presumed where buildings would ultimately be located in the Village, and then assumed that all buildings in any given part of the Village would be constructed at the same time — resulting in a shorter period of construction noise. Or perhaps it could have assumed something else altogether. But any estimate, as far as we can tell, would entail a fair bit of speculation. As the EIR explained, the "sequence and pace for constructing various land uses and facilities" would depend on market considerations over decades. And as it further explained, even the specific location of the project's buildings is not yet clear. So while Sierra Watch may have preferred detailed estimates about construction duration in each specific location in the Village, the EIR was not required to supply speculative estimates. A lead agency, after all, need not speculate about project impacts (see CEQA Guidelines, § 15145) and instead may discuss potential project impacts at a "level of specificity . . . determined by the nature of the project and the rule of reason" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 233; see also CEQA Guidelines, § 15146).

Given these considerations, we decline to find that the absence of estimates of construction duration for the Village is fatal to the EIR. And we find that true even though the EIR offered an estimate for the East Parcel of 24 to 30 months. On that last point, Sierra Watch maintains that because the County provided an estimate of construction time for the East Parcel, it also needed to provide an estimate of construction time for the Village. But the East Parcel and the Village, as the EIR made clear, were not comparable. The EIR noted that the Village consisted of two general areas (the "Village Core" and the "Village Neighborhood"), said that the location of the buildings in each area was "flexib[le]," and explained that the assigned building density for lots within each area could change up to 25 percent, as the project allowed "for transfer of density" up to 25 percent "between lots within each planning area (i.e., Village Core or the Village Neighborhoods)." All those features, the EIR indicated, tended to make estimating

30

construction noise in any given part of the Village problematic — far more so than for the smaller and more predictable East Parcel, which would be about a tenth of the size of the Village. Considering these distinctions, that the County could estimate construction times for the East Parcel does not necessarily mean it could also estimate construction times for the Village.

Sierra Watch next asserts that "the EIR does not analyze the Project's full geographic range of noise impacts, for it ignores activities occurring farther than 50 feet from sensitive receptors." We agree on this point. The EIR discussed noise impacts to "sensitive receptors" lying within 50 feet of expected construction activity. It explained that, "at 50 feet from the acoustical center of the construction site," daytime "construction-related activities . . . could result in noise levels of up to 94 dBA $L_{eq}$ and 98 dBA $L_{max}$" — louder than a gas lawn mower at three feet.[6] It added that, "at 50 feet from the construction site," "[n]ighttime construction activities could result in noise levels of up to 79 dB[A] $L_{eq}$ and 84 dB[A] $L_{max}$" — about as loud as a garbage disposal at three feet. Based on these considerations, the EIR concluded that these daytime and nighttime noise levels could significantly disturb certain "sensitive receptors" sitting at or within 50 feet of expected construction activity. But, with one exception for a boarding school, the

---

[6]  The terms dB, dBA, $L_{eq}$, and $L_{max}$ are shorthand for decibels (dB), A-weighted decibels (dBA), A-weighted equivalent sound level ($L_{eq}$), and A-weighted maximum sound level ($L_{max}$). Because these terms are probably unfamiliar to most, we will briefly summarize the meaning of each. Decibels are the units of measurement for sound intensity. Because knowing a sound's decibel level does not in itself adequately characterize how humans perceive the sound, the sound is often described in terms of A-weighted decibels — which, unlike unweighted decibels, account for the human ear's varying sensitivity to different frequencies. To account for varying sound levels over time, the sound is also often described in terms of the A-weighted equivalent sound level — which represents the average sound level over a specified period — and in terms of the A-weighted maximum sound level — which represents the highest sound level over a specified period.

31

EIR never considered impacts to sensitive receipts lying outside this 50-foot zone. Nor did it discuss its reasons for not doing so. As a result, while the EIR would acknowledge significant impacts to a receptor sitting 50 feet from expected construction activity, it would altogether ignore potential impacts to a receptor sitting an inch more distant — even though the noise levels at these two distances would presumably be the same.

We find the EIR fell short with this arbitrary line drawing. A lead agency cannot ignore a project's expected impacts merely because they occur, as Sierra Watch puts it, "outside an arbitrary radius." Our Supreme Court has long demonstrated as much, explaining, for example, "that an EIR may not ignore the regional impacts of a project proposal, including those impacts that occur outside of its borders." (*Citizens of Goleta, supra*, 52 Cal.3d at p. 575.) And if an EIR cannot ignore a project's impacts on the surrounding region, it certainly cannot ignore its impacts on sensitive areas sitting only a little over 50 feet from the project. That is particularly true here, as the EIR itself acknowledged that sound impacts may be significant even beyond 50 feet. In particular, in discussing the boarding school, the EIR acknowledged the school would experience noise levels up to 85 decibels, even at a distance of 250 feet from construction activity. And it acknowledged also that these noise levels would cause a significant impact. But without any apparent explanation, it declined to consider potential noise impacts to other receptors sitting at a similar distance from planned construction activities. That was improper.

Attempting to address this issue, respondents contend it is "standard" to "focus[] on receptors located within 50 feet of construction activities." But even assuming that is true, respondents have not shown it is standard, or appropriate, to ignore evidence of noise disturbance outside this radius. Nor have they shown, as they allege, that this is "a methodological issue" for which they are "entitled to deference." An agency, to be sure, "may" be entitled to deference in its "decision as to which methodologies to employ for analyzing an environmental effect." (*Sierra Club*, *supra*, 6 Cal.5th at p. 516.) But it

32

cannot employ a methodological approach in a manner that entirely forecloses consideration of evidence showing impacts to the neighboring region, impacts beyond a project's boundaries, or, as occurred in this case, impacts to areas sitting beyond 50 feet from construction activities.  (See *Citizens of Goleta Valley*, *supra*. 52 Cal.3d at p. 575 ["an EIR may not ignore the regional impacts of a project proposal, including those impacts that occur outside of its borders"]; cf. *East Sacramento Partnerships*, *supra*, 5 Cal.App.5th at p. 303 [" 'a threshold of significance cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be significant' "].)

Third, Sierra Watch contends "the EIR never describes the nature of the noise impact, i.e., how noise could affect residents' living patterns, speech, sleep, and health." But, contra Sierra Watch's claim, the EIR specifically acknowledged that construction activities could "result in increased annoyance," cause "potential sleep disruption," and "cause speech disruption" for occupants of nearby residences.  It explained that daytime "construction-related activities . . . could result in noise levels of up to 94 dBA $L_{eq}$ and 98 dBA $L_{max}$" and "[n]ighttime construction activities could result in noise levels of up to 79 dB[A] $L_{eq}$ and 84 dB[A] $L_{max}$."  It further explained that, "with typical noise attenuation of 25 dBA by walls and windows, interior noise levels could be as high as 69 dBA $L_{eq}$/73 dBA $L_{max}$ during the day (high enough to cause speech disruption), and 54 dBA $L_{eq}$/61 dBA $L_{max}$ at night during nighttime construction (which may cause sleep disruption)."  And it also explained the significance of those figures, noting that 69 to 73 dBA is about as loud as a noisy urban area and 54 to 61 dBA is about as loud as, on the high end, a commercial area and, on the low end, a quiet urban area in the daytime.  Based on these considerations, the EIR included mitigation to address noise impacts but, "despite this," still found noise impacts would be "significant and unavoidable."  Considering this discussion, we reject Sierra Watch's contention that the EIR "never" described "how noise could affect residents' living patterns, speech, sleep, and health."

33

Before turning to Sierra Watch's contentions concerning the EIR's mitigation measures for noise impacts, we briefly consider a County ordinance that exempts daytime construction noises from its typical noise standards. Both parties briefly mention the ordinance. Respondents, for example, note "the County could have found daytime construction noise exempt and therefore insignificant" — though they then quickly add that the County declined to take that approach. Respondents' claim is a questionable one. Although the County's ordinance may have exempted daytime construction noise from the County's typical noise requirements, that does not necessarily mean the County could have relied on this ordinance to prevent consideration of evidence of noise impacts under CEQA. (See *Berkeley Keep Jets Over the Bay Com v. Board of Port Comrs* (2001) 91 Cal.App.4th 1344, 1380 [CEQA did not define "significant noise impacts simply in terms of whether a project would violate applicable local, state, or federal noise standards"]; see also *East Sacramento Partnerships*, *supra*, 5 Cal.App.5th at p. 303 [" 'a threshold of significance cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be significant' "].) In any event, because the County disclaims reliance on the ordinance in the EIR and in the briefing, we need not discuss the issue further.

B. *Mitigation*

We consider next Sierra Watch's challenge to the EIR's mitigation measures for noise impacts.

First, it argues, "because the EIR fail[ed] to adequately analyze the Project's construction-noise impacts, the County never effectively mitigated them." Sierra Watch raises the point prematurely. Although we agree the EIR improperly ignored noise-related impacts beyond a certain radius, we cannot, at this stage, say those unconsidered impacts were insufficiently mitigated. Perhaps the EIR's existing mitigation measures sufficiently mitigated these impacts. Perhaps not. Because these impacts have yet to be considered, we will not prematurely speculate on the topic.

34

Next, Sierra Watch alleges the EIR arbitrarily applied some of its mitigation measures to benefit only certain sensitive receptors — an argument that focuses on the EIR's different treatment of the school and other nearby buildings. To mitigate impacts to the school, the EIR included the following mitigation: "Construction on the East Parcel shall be designed to avoid intrusive noise, defined as an interior noise level of 45 dBA $L_{eq}$/65 dBA $L_{max}$ or greater, during the time when classroom activities take place at the [school]." The EIR also described potential methods to achieve those noise levels, including by replacing windows and increasing insulation at the school. But the EIR included no similar measure to protect other sensitive receptors, and Sierra Watch contends the EIR is faulty as a result. We disagree. The County noted it would be "infeasible" to provide similar protections for all affected receptors, and it explained why it provided this measure for the school in particular — "it would protect the primary function of [the school]: educating students during daytime classes when construction activities would typically take place." Sierra Watch contends this "rationale arbitrarily refuses to protect the primary functions of other equally sensitive receptors, like residences and churches." But given the absence of any information about these "residences and churches" and "other equally sensitive receptors" in Sierra Watch's briefing, we do not find the County acted improperly in including additional protections for the school, a receptor found to be particularly sensitive to daytime noise, but not these other receptors.

Lastly, Sierra Watch alleges the EIR includes "no performance standards" for most of its mitigation measures, and so "never assures that the measures would actually avoid noise impacts." Sierra Watch focuses on two mitigation measures in particular: one that requires construction equipment to be "properly maintained and equipped with noise-reduction intake and exhaust mufflers and engine shrouds, in accordance with manufacturers' recommendations," and another that requires "operations and techniques" to "be replaced with quieter procedures (e.g., using welding instead of riveting, mixing

35

concrete off-site instead of on-site) where feasible and consistent with building codes and other applicable laws and regulations." Both measures, Sierra Watch alleges, are too vague.[7]

We reject Sierra Watch's challenge to the first measure. That measure, again, requires construction equipment to be "properly maintained and equipped with noise-reduction intake and exhaust mufflers and engine shrouds, in accordance with manufacturers' recommendations." In our view, this measure establishes two concrete requirements: (1) equipment must be maintained in accordance with the manufacturer's recommendations, and (2) equipment must be fitted with specified noise-reducing technologies. Although Sierra Watch maintains the measure is nonetheless too vague, it never explains why that is so. We reject the argument.

But we agree the second challenged mitigation measure falls short. That measure, again, requires "operations and techniques" to "be replaced with quieter procedures (e.g., using welding instead of riveting, mixing concrete off-site instead of on-site) where feasible and consistent with building codes and other applicable laws and regulations." The measure is specific in terms of its examples — construction contractors must weld instead of rivet and mix concrete off-site instead of on-site. But it is otherwise entirely vague — "operations and techniques shall be replaced with quieter procedures . . . where feasible." This language, in effect, only tells construction contractors to be quieter than normal when they can. Although that may be good neighborly advice, it is not sufficient as a mitigation measure. It defers until later the determination of which construction procedures can feasibly be changed and how these procedures can be modified to be quieter. And it offers no instruction on how either of these determinations are to be

---

**7**      Sierra Watch suggests that other mitigation measures are also inadequate, but it never discusses those other measures and so we will not consider them. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784-785.)

made.  It is inadequate as a result.  (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 520 [finding inadequate a mitigation measure that set a "generalized goal" for reducing emissions and then, to achieve that goal, relied on "unspecified and undefined" protocols]; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 281 [finding inadequate a mitigation measure that required the future approval of a habitat management plan but did not "describe the actions anticipated for active management" or "specify performance standards or provide other guidelines for the active management requirement"]; see also CEQA Guidelines, § 15126.4, subd. (a)(1)(B).)

V

*Climate Change Impacts*

Sierra Watch also, for several reasons, challenges the County's discussion of climate change impacts.

Before turning to its specific contentions, we provide some background on the EIR's evolving evaluation of climate change impacts.  In evaluating climate change impacts, the draft EIR distinguished between emissions occurring by 2020 and emissions occurring after 2020.  Focusing first on emissions occurring by 2020, the draft EIR said the project's impacts would be less than significant if its emissions (1) would be no more than 1,100 metric tons of carbon dioxide equivalent ($MTCO_2e$) per year or (2) if above 1,100 $MTCO_2e$ per year, would at least be consistent with statewide greenhouse gas (GHG) emissions targets described in the California Air Resources Board's 2008 Climate Change Scoping Plan (the Scoping Plan).  The Scoping Plan, as revised in 2011, established a 2020 emissions target that was about 21.7 percent below emissions levels projected under a business-as-usual scenario — meaning, a scenario that assumes no conservation or regulatory efforts would be taken to help achieve a reduction in greenhouse gases.  According to the draft EIR, so long as the project's emissions by 2020 would be at least 21.7 percent below business as usual, the project would be consistent

37

with the Scoping Plan's 2020 emissions target. With this framework in mind, the draft EIR then estimated projects emissions to be 46,994 $MTCO_2e$ per year under a full-buildout scenario in 2020 and 62,931 $MTCO_2e$ per year under a business-as-usual full-buildout scenario in 2020 — though the EIR labeled both these scenarios purely "hypothetical" "because full buildout . . . would occur no sooner than 2037." Because 46,994 $MTCO_2e$ is over 21.7 percent below 62,931 $MTCO_2e$, even though well above 1,100 $MTCO_2e$, the draft EIR said the project would at least be consistent with 2020 emissions targets and so would have less than a significant impact when viewed from that perspective.

Turning next to emissions occurring after 2020, the draft EIR applied a similar framework for evaluating project impacts. First, as when analyzing emissions under a "hypothetical" 2020 full-buildout scenario, the draft EIR said emissions under a 2037 full-buildout scenario would well exceed 1,100 $MTCO_2e$ per year. In particular, it estimated these emissions to be 45,403 $MTCO_2e$ per year — an estimate that was, the draft EIR explained, slightly lower than the 2020 full-buildout estimate "because a certain percentage of older vehicles projected to be on the road in 2020 would" not be on the road in 2037. But it found it impossible to determine whether these emissions would be consistent with post-2020 emissions targets, as "the ability of the project to meet GHG targets beyond 2020 is unknown, and cannot be known because these targets have not been established." And so, the draft EIR said, "[b]ecause the project would generate substantial GHG emissions" (i.e., emissions "well above" 1,100 $MTCO_2e$ per year), "and because it is not known if the project would be consistent with future GHG reduction targets, the impact would be potentially significant."

Shortly after the County shared its draft EIR, the California Supreme Court rejected the type of analysis that the draft EIR had, in part, followed. Again, according to the draft EIR, if the project's emissions by 2020 would be at least 21.7 percent below business as usual, it would not conflict with the Scoping Plan's stated goal of reducing

emissions by about 21.7 percent compared to business as usual. But in *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204 (*Center for Biological Diversity*), the court rejected that type of logic. It reasoned that a *project-level* reduction in emissions of, say, 25 percent compared to business as usual is not necessarily consistent with achieving a *statewide* reduction in emissions of 21.7 percent compared to business as usual. (*Id.* at pp. 225-226.) It is more complicated than that. Achieving a statewide reduction in emissions of 21.7 percent, the court explained, would presumably demand different levels of reduction from different projects. New projects, for example, may very well need to achieve a greater level of reduction relative to the state as a whole to account for the lesser degree of reduction possible for older structures and systems. (*Id.* at p. 226.) And so although a reduction of 25 percent may be enough for some projects, it may not be enough for others. Those types of considerations in mind, the court found an agency could not simply assume a project-level reduction of at least 21.7 percent would necessarily be consistent with the Scoping Plan's stated goal of a statewide reduction of 21.7 percent. (*Id.* at pp. 226-227.)[8]

In response to this decision, the County later modified its climate change analysis in the final EIR. No longer attempting to determine whether the project's emissions would be consistent with the Scoping Plan, the County simply concluded that project emissions, whether before 2020 or after, would be significant if they exceeded 1,100 $MTCO_2e$ per year. And because they would, the final EIR said the project's climate change impact would be potentially significant.

---

[8]     The court described the Scoping Plan as setting a goal of reducing emissions by 29 percent, not 21.7 percent. (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 216.) That higher percentage reflects the Scoping Plan's initial estimate in 2008 concerning the percentage reduction required to meet the statewide emissions target. An updated Scoping Plan, based on more recent data from 2011, revised this percentage downward to about 21.7 percent.

With that factual background, we now turn to Sierra Watch's arguments.

A. *Recirculation*

Sierra Watch first contends the County's changes in the final EIR required it to recirculate the EIR for further public review and comment. That is so, it reasons, because the final EIR's "revamped analysis" revealed "far more severe climate change impacts than disclosed in the" draft EIR. We reject the claim.

CEQA requires a lead agency to recirculate an EIR when "significant new information" is added to the EIR after the draft EIR has been released to the public for review and before certification. (Pub. Resources Code, § 21092.1.) An EIR includes "significant new information" if, among other things, it (1) reveals "[a] new significant environmental impact [that] would result from the project," (2) reveals "[a] substantial increase in the severity of an environmental impact [that] would result unless mitigation measures are adopted that reduce the impact to a level of insignificance," or (3) shows that "[t]he draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (CEQA Guidelines, § 15088.5, subd. (a).)

In evaluating whether the EIR here revealed "significant new information," we first note, as Sierra Watch points out, that the County relied in part on different standards for reviewing the project's impacts in the draft EIR and the final EIR. The draft EIR supplied two approaches for reviewing impacts — one based on emissions occurring by 2020 and another based on emissions occurring after 2020. In terms of emissions occurring by 2020, the draft EIR said the project's impacts would be less than significant because, if the project were completed in 2020, project emissions would be at least 21.7 percent below a projected business-as-usual scenario — which, it said, showed the project would be consistent with the Scoping Plan. But in terms of emissions occurring after 2020, it said the project's impacts would be potentially significant "[b]ecause the project would generate substantial GHG emissions" (i.e., emissions "well above" 1,100

40

$MTCO_2e$ per year), "and because it is not known if the project would be consistent with future GHG reduction targets." The final EIR, however, took a somewhat different approach. Finding it impossible to determine whether the project's emissions would be consistent with emissions targets, whether those set for 2020 or after, the final EIR simply said the project's impacts would be significant if emissions exceeded 1,100 $MTCO_2e$ per year. This, we agree, was a change from the draft EIR.

But we reject Sierra Watch's contention that this change revealed "far more severe climate change impacts." Sierra Watch reasons it did so because the project's emissions would "vastly exceed[]" the final EIR's "new" standard for evaluating significance — whether emissions would exceed 1,100 $MTCO_2e$ per year. But the County's purportedly "new" standard in the final EIR was also its main standard in the draft EIR. True, in the draft EIR, the County applied a somewhat different standard when evaluating impacts under a scenario involving full project buildout by 2020. In that discussion, again, the County considered whether the project's emissions would be consistent with the Scoping Plan's 21.7 percent target. But the County labeled that scenario "unrealistic" and merely "hypothetical" because "full buildout . . . would occur no sooner than 2037." And in considering the emissions targets realistically applicable to the project — that is, post-2020 emissions targets — the County effectively applied the same standard that Sierra Watch contends was newly added in the final EIR: it considered whether emissions would exceed 1,100 $MTCO_2e$ per year. And because they would well exceed that amount, and because the EIR found it impossible to determine consistency with post-2020 emission targets, the County found the project's impacts would be potentially significant. So although Sierra Watch is right to say the project's expected emissions would vastly exceed the 1,100 $MTCO_2e$ threshold, it is wrong in saying this exceedance was revealed for the first time in the final EIR.

Attempting to counter this point, Sierra Watch expresses concern that the project's emissions could "vastly exceed" the 1,100 $MTCO_2e$ threshold even before full project

41

buildout, perhaps even by 2020; and so, it suggests, recirculation is still required based on the draft EIR's flawed discussion of the project's consistency with 2020 emissions targets. In support of its contention that significant emissions could occur by 2020, Sierra Watch states that 20 percent of the project could, per the EIR, be constructed in one year, even if full project buildout would take 25 years. That is true, and perhaps this shows that, at one point in time, emissions could have "vastly exceed[ed]" the 1,100 $MTCO_2e$ threshold by 2020. But that is no longer the case. Because of the length of this litigation, the project no longer has the potential to result in any operational emissions by 2020. For this reason, our focus is on the EIR's discussion of the project's impacts under post-2020 emissions targets. And on that topic, again, the draft EIR and the final EIR were consistent: Because the project's emissions would vastly exceed 1,100 $MTCO_2e$ per year, and because it would be impossible to determine whether these emissions would be consistent with post-2020 targets, these emissions would be potentially significant.

In its reply brief, Sierra Watch also attacks the EIR's discussion of these post-2020 emissions targets, alleging it is inadequate "because, like the 2020 analysis, it depends on statewide targets not linked to the Project." But we do not fault the County for failing to "link[]" the project's emissions to statewide targets that were not even developed at the time of the EIR. We may expect a certain degree of thoroughness, but we do not expect the impossible. In any event, Sierra Watch forfeited this argument by raising it for the first time in its reply brief. (See *Neighbours v. Buzz Oates Enterprises*, *supra*, 217 Cal.App.3d at p. 335, fn. 8 [claims raised for the first time in a reply brief, without good cause, are forfeited].)

B. *Mitigation*

Sierra Watch next faults the County for failing to "reconsider the [draft] []EIR's climate mitigation in light of the [final] []EIR's new analysis." In particular, it appears to argue that the final EIR, unlike the draft EIR, recognized the project could result in

42

potentially significant impacts by 2020 but then wrongly failed to reconsider mitigation following this new finding.  We reject this argument too.

To start, the County did reconsider its mitigation measures in the final EIR.  It was in fact explicit on the point, stating in the final EIR that it was "revis[ing]" one of its mitigation measures "[i]n response to the recent California Supreme Court decision" in *Center for Biological Diversity*.  In its revision, the County appeared to acknowledge that project impacts could be significant even by 2020.  And so unlike the draft EIR, which only required mitigation for certain actions "after December 31, 2020," the final EIR required mitigation even for actions occurring on or before 2020.  In particular, "for all subdivision maps submitted for approval," no matter when submitted, the final EIR required Squaw (1) to determine whether the operation of the subdivision would be consistent with statewide emissions targets and (2) if it would not, to incorporate certain mitigation measures into the subdivision to reduce greenhouse gas emissions.

Apart from neglecting to acknowledge the final EIR's reconsideration of its mitigation measure, Sierra Watch's argument also falls short for a more basic reason.  Its argument, again, appears to be premised on its view that the County failed to reconsider its mitigation following "newly revealed significant impacts" that could occur by 2020.  But as we have discussed, although the project may at one point have resulted in emissions above the 1,100 MTCO$_2$e threshold by 2020, that is no longer true.  That in mind, we will not require the County to reconsider mitigation for impacts that now have no prospect of occurring.

Sierra Watch also challenges the County's EIR for two additional reasons, but we find both these arguments forfeited.  First, because the EIR's mitigation measure is triggered only if the project is inconsistent with post-2020 emissions targets that have yet to be established, Sierra Watch contends the EIR's mitigation measure is "illusory."  But Sierra Watch offers this argument in a section of its brief that, according to the heading, concerns an entirely different topic — namely, the County's alleged failure to

43

"[re]examine feasible mitigation measures in light of the [final] [EIR's] new climate change analysis." According to this heading, all that follows would concern the final EIR's "new . . . analysis" of the project's consistency with 2020 emissions targets in light of the *Center for Biological Diversity* decision. But under this heading, Sierra Watch also raised an altogether different issue concerning the final EIR's analysis of the project's consistency with *post*-2020 emissions targets — which, again, was unaffected by the *Center for Biological Diversity* decision. It erred in doing so. Sierra Watch needed to raise its distinct argument concerning the EIR's allegedly improper reliance on post-2020 emissions targets "under a separate heading or subheading summarizing the point," as required under California Rules of Court, rule 8.204(a)(1)(A). Because it failed to do so, the argument is forfeited. (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1831, fn. 4.)

Second, Sierra Watch contends the County "ignor[ed] feasible mitigation measures that were available." But it never describes the mitigation measures that the County allegedly ignored. Nor does it explain how these alleged measures are feasible. It simply states its conclusion and then cites to various parts of the record. We find Sierra's Watch's undeveloped argument forfeited as a result. Courts, after all, " 'are not bound to develop appellants' arguments for them.' [Citation.]" (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1099.)

VI

*Traffic Impacts*

Finally, for two reasons, Sierra Watch contends "the EIR fail[ed] to properly identify mitigation for the project's significant transportation impacts." First, it asserts the "EIR overlook[ed] feasible mitigation for the project's significant traffic impacts." And second, it contends the "EIR improperly relie[d] on deferred mitigation to address transit impacts." We agree with the second point.

44

A. *Mitigation for Traffic Impacts*

We consider first Sierra Watch's contention that the EIR "overlook[ed] feasible mitigation."

In the draft EIR, the County proposed several measures to mitigate traffic impacts, including, among other things, measures requiring Squaw to develop a traffic management plan, install a new traffic signal, and develop a website and a smartphone app that would show real-time information about available parking spaces and average travel speed on Squaw Valley Road. The draft EIR found these measures would reduce traffic impacts but, in the end, concluded that impacts in some areas would remain significant even after mitigation.

Sierra Watch afterward encouraged the County to require Squaw to implement additional measures that the draft EIR had mentioned, but had not required, in its discussion of air quality impacts. The draft EIR there required Squaw to limit certain emissions below a specified level and mentioned various measures that Squaw could implement to ensure compliance with this requirement. But rather than requiring Squaw to implement any of the mentioned measures, the draft EIR instead gave Squaw flexibility in terms of the tools it used to limit project emissions. Believing these same measures could also help address traffic impacts, Sierra Watch asked the County to consider imposing them as mitigation for traffic impacts. In particular, it encouraged the County to require Squaw to provide (1) "free or discounted transportation service between the Village and the Amtrak station in Truckee to all overnight visitors who arrive by train," (2) "discounted overnight accommodations, meals, activities, or other incentives to visitors who arrive by train to the Amtrak station in Truckee and/or to groups who arrive by bus or some other emissions-efficient vehicle type," (3) "free, shared, or discount rental bicycles to all visitors staying in the hotel or resort residential units," (4) "shuttle service to other key destinations in the region (e.g., North/West Shore of Lake Tahoe, casinos, Truckee) to serve guests who want to tour regional offerings,"

45

(5) "a covered bicycle parking area near [the] entrance of all commercial establishments," (6) "parking for and subsidi[es] [for] a car-sharing service for resort employees and/or patrons," (7) " 'end-of-trip' facilities for employees who bike to their work sites from outside of [Olympic] Valley, including showers, secure weather-protected bicycle lockers, storage lockers for other gear, and changing spaces," (8) "free transit passes or reimburse[ment] [for] the transit costs of employees who commute from outside Olympic Valley using Tahoe Area Regional Transit or another transit service," (9) "adequate secure weather-protected bicycle lockers or storage area for employees living at the East Parcel," and (10) "virtual and/or real bulletin boards in common areas of employee housing units and other areas where employees congregate to foster the development of carpools and other ride sharing opportunities."

But the County declined these requests. The final EIR "acknowledged that implementation of a combination of these measures would serve a dual purpose of reducing air quality as well as transportation impacts." But for several reasons, it declined to require Squaw to implement these measures. First, it stated that "some of these measures may be more effective in reducing air quality emissions than traffic." Offering one example, it said encouraging use of Amtrak through a shuttle service might reduce air emissions by reducing a few longer vehicle trips, but it "would likely have limited [traffic] benefit" because "there is very limited train service (currently only one stop per day from Sacramento at Truckee, for example)" and the shuttle would itself add to local traffic. The EIR also appeared to express doubt that many people would be persuaded by a shuttle service, suggesting that most people would still drive anyway because "the train typically takes far longer to transport people from Sacramento and the Bay Area than cars."

Second, the EIR said the project already included some "transportation elements" similar to Sierra Watch's proposals, including preferred parking for carpoolers, a centrally located transit center, a shuttle service for transportation in the Village, bicycle

46

parking at all "major activity centers," and transit service "between the Village area and other key lodging and residential areas" within Olympic Valley. Also, the EIR added, Squaw would consider installing a real-time traffic communications system around the Village and would consider providing access to bicycles for guests and visitors, activities to "encourage day skiers to linger in the Village until after exiting traffic volumes recede," incentives to encourage more overnight stays and reduce the proportion of day skiers, and a multipurpose path linking the East Parcel to the Village.

Finally, in rejecting Sierra Watch's proposed measures, the EIR said these measures would only have a "speculative" benefit. On that point, it noted, even for those similar features that were incorporated into the project, it could not confirm that they would result in any trip reductions; data simply "did not exist to justify specific trip decreases."

Sierra Watch challenges the EIR's response for several reasons. It first contends the County "ignored" most of Sierra Watch's proposed measures. Had it done so, we would agree that the County acted inappropriately. CEQA, after all, requires agencies to "respond to comments raising significant environmental issues" in "good faith" and with "reasoned analysis." (CEQA Guidelines, § 15088.) And courts have recognized that this requirement obligates agencies to " 'respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible.' [Citation.]" (*Covington v. Great Basin Unified Air Pollution Control Dist.* (2019) 43 Cal.App.5th 867, 879.) But the final EIR did not, as Sierra Watch claims, ignore the suggested mitigation measures. The final EIR, for example, said one proposed measure (concerning shuttle service to and from the Amtrak station) "would likely have limited benefit," and it said the remaining measures would only have a "speculative" benefit. Although true the EIR did not call out all the proposed measures individually — it did not, for example, say the first proposed measure would have a speculative benefit, the second proposed measure would have a speculative benefit, and so on — we cannot say

47

the EIR entirely "ignored" these measures for that reason.  In taking a contrary position, Sierra Watch appears to be led astray by an incomplete understanding of the EIR's response.  Although it acknowledges, for example, that the EIR found one of its proposed measures would likely have limited benefit, it never acknowledges that the EIR also found the remaining proposed measures would have a speculative benefit.  And so it never acknowledges that the EIR did respond, albeit briefly, to the entirety of its comment.

Sierra Watch next asserts that the final EIR, in addition to ignoring some of its proposed measures, "only vaguely responded to, or partially implemented, the others." But we find neither contention persuasive.  First, to the extent the EIR only partially implemented Sierra Watch's proposed measures, it explained why it did so:  These measures would only have a "speculative" benefit — an explanation that Sierra Watch never challenges.  Second, on the topic of vagueness, we find the final EIR's response was specific, not vague.  It rejected the proposed measures, again, because one proposal concerning shuttle service to Amtrak "would likely have limited benefit," offering several reasons as to why, and the others would only have a "speculative" benefit.  It also noted the project already included several features similar to some, though not all, of the measures Sierra Watch proposed.  But even for those features — which included preferred parking for carpoolers, a shuttle service, transit service, and bicycle parking — the EIR noted that they too would have only a speculative benefit "because data did not exist" showing they would reduce trips by any specific amount.  Whatever the potential shortcomings of this response, we do not find vagueness to be one of them.

B.  *Mitigation for Transit Impacts*

Lastly, we consider Sierra Watch's contention that the EIR improperly relied on deferred mitigation to address transit impacts.

The draft EIR said the project would increase demand on the existing public transit system (known as Tahoe Area Regional Transit or TART) and would, as a result,

48

have a potentially significant impact on transit. But it said Squaw's commitment either to provide "fair share funding" to TART or to form a "Community Service Area (CSA) or a Community Facilities District (CFD) to fund the costs of increased transit services" would mitigate this impact to a less-than-significant level. It then noted how transit services could potentially be increased, stating that "[i]ncreased service may consist of more frequent headways, longer hours of operations, and/or different routes." The final EIR added little new, though it did include some detail on how the "fair share funding" would be calculated: "The fair share would be based on an engineer's report and would establish the project's financial contribution to additional transit services."

We agree this measure wrongly defers the details of mitigation. Agencies, in general, should not defer the specific details of a mitigation measure until after project approval. But they may do so "when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure." (CEQA Guidelines, § 15126.4, subd. (a)(1)(B).)

But as Sierra Watch notes, the EIR's mitigation measure for transit impacts includes no performance standard at all. Nor does it provide any analysis supporting its conclusion that the project's impacts on transit would be rendered less than significant. Rather than supply this analysis, the EIR simply requires Squaw to provide an unspecified amount of funding to increase transit service by an unspecified amount in the future, and then, without any analysis, says this vague offer to increase transit service would reduce impacts to a less-than-significant level. That, however, is not good enough to satisfy CEQA. (See *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 855, 857-858 [finding inadequate a mitigation measure that required the project applicant to "increase" the use of "produced water" and "reduce" the use of

49

"municipal and industrial quality" water "to the extent feasible"; the terms "increase" and "reduce," even when modified by the phrase "to the extent feasible," are not specific performance standards]; *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 79-80 [finding inadequate a mitigation measure that required a project applicant to expand a city's busing "capacity by paying an unspecified amount of money at an unspecified time in compliance with an as yet unenforced or unspecified transit funding mechanism"].)

Respondents counter that "the only open issue is the final funding amount" and that agreeing to pay fees to increase transit service "is appropriate mitigation." We find both contentions unpersuasive. First, beyond leaving the funding amount unresolved, the EIR also never clearly explained how that funding would be used — something respondents acknowledged at trial, stating "[t]he EIR declined to speculate on how TART will expand service."

Second, although "[m]itigation fee programs *may* constitute adequate mitigation to address the adverse effects of a project," we find the fee program here falls short. (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 199.) To be adequate, fair-share mitigation fees must be "part of a reasonable, enforceable plan or program that is sufficiently tied to the *actual mitigation* of the traffic impacts at issue." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1189, italics added.) But here, we cannot say the required fair-share fee satisfies those conditions. The EIR neither estimates the amount of the fair-share contribution, nor specifies how this contribution will be used, nor reasonably explains why this undefined contribution can be expected to reduce expected impacts to a less-than-significant level. Instead, it does little more than note that the required fees would "increase[] transit service." But a vague offer to increase transit service in the future is not a specific performance standard. (See CEQA Guidelines, § 15126.4, subd. (a)(1)(B); *King & Gardiner Farms, LLC v. County of Kern*, *supra*, 45 Cal.App.5th at p. 858 ["[t]he

50

term[] 'increase' . . . — even though preceded by the mandatory term 'shall' . . . — [is] not [a] specific performance standard[]"].)  It is instead "the sort[] of speculative mitigation measure[] that do[es] not comply with CEQA."  (*California Clean Energy Committee*, *supra*, 225 Cal.App.4th at p. 198 [finding inadequate fair-share mitigation requirements that "d[id] not estimate how much the mitigation measures . . . w[ould] cost or how they might be implemented"]; see also *Gray v. County of Madera, supra*, 167 Cal.App.4th at p. 1122 [finding inadequate a mitigation measure that required the applicant "to '[c]ontribute an equitable share of the cost of construction of future [highway] improvements' " but included no definite commitment to make improvements that would mitigate the project's impacts].)

DISPOSITION

The judgment is reversed.  The trial court is instructed to enter, consistent with this opinion, a new judgment granting the petition for writ of mandate and specifying those actions the County must take to comply with CEQA.  Sierra Watch is entitled to recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                        /s/
                                    BLEASE, J.



We concur:


     /s/
RAYE, P. J.


     /s/
DUARTE, J.


51

Filed 9/22/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SIERRA WATCH, | C088130 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0038777) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents; | |
| SQUAW VALLEY REAL ESTATE, LLC, | |
| Real Party in Interest and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed August 24, 2021, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

_____

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III, V, and VI of the Discussion.

1

EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Placer County, Michael W. Jones, Judge. Reversed.

Shute, Mihaly & Weinberger, Amy J. Bricker, Laura D. Beaton, Rachel B. Hooper; and Daniel P. Selmi for Plaintiff and Appellant.

Office of the Placer County Counsel and Clayton T. Cook for Defendants and Respondents County of Placer and Placer County Board of Supervisors.

Remy Moose Manley, Whitman F. Manely, Andrea K. Leisy and Nathan O. George for Real Party in Interest and Respondent Squaw Valley Real Estate, LLC.

BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
BLEASE, J.


_____/s/_____
DUARTE, J.

2